**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| JUDY MAY, et al., | Case No.  24-cv-01314-BLF |
| Plaintiffs, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS** |
| GOOGLE LLC, et al., | |
| Defendants. | [Re:  ECF No. 121] |

Plaintiffs allege liability against Google after they fell prey to scammers fleecing them out of the value of their Google Play gift cards.  This class action suit is brought by Denver May as Successor in Interest of Judy May, Maureen Kennedy, and Joan Ehly (collectively, "Plaintiffs") on behalf of all others similarly situated.  Plaintiffs filed a Second Amended Class Action Complaint against Google LLC, Google Arizona LLC, Google Payment Corp., and Does 1-10 (collectively, "Defendants" or "Google") on July 17, 2025.  ECF No. 114 ("SAC").

In the SAC, Plaintiffs assert seven causes of action: (1) unfair practices in violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200; (2) unlawful practices in violation of the UCL; (3) unfair practices in violation of the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750–1784; (4) unlawful practices in violation of the CLRA; (5) receiving, retaining, withholding, or concealing stolen property in violation of section 496 of the California Penal Code; (6) conversion; and (7) declaratory judgment pursuant to 28 U.S.C. § 2201.  SAC ¶¶ 245–332.

Before the Court is Defendants' combined motion to dismiss the SAC and strike the class allegations therein.  ECF No. 121 ("Mot."); *see also* ECF No. 128 ("Reply").  Plaintiffs oppose the motion.  ECF No. 127 ("Opp.").  The Court held a hearing on the motion on December 12, 2025.

*See* ECF No. 133; ECF No. 137 ("Tr.").  For the reasons that follow, Google's motion is GRANTED IN PART AND DENIED IN PART.

I.    **BACKGROUND**

    **A.  Facts**

The following allegations come from the SAC and are taken as true for the purposes of this motion.

    **1.    Google's Digital Platforms and Their Developers**

Google owns and operates the Google Play Store, which hosts millions of mobile applications ("apps") and digital multimedia content for consumers to purchase and download. SAC ¶¶ 20–21.  Google implements a service fee structure where Google charges a commission of approximately 15–30% on all paid apps, in-app purchases, and app subscriptions, including those made with Google Play gift cards.  SAC ¶ 60.  Users must establish a Google Account with detailed personal information to access and purchase apps and content from the Google Play Store. SAC ¶¶ 33–34.  This includes "their name, birthdate, gender identification, and a recovery email address."  SAC ¶ 33.  All Google Accounts must be verified with the associated telephone number or email address.  SAC ¶ 34.

Individuals and companies can develop apps for distribution on the Google Play Store as "Google Play Developers."  SAC ¶ 53.  Google Play Developers are required to create a Google Account, enter into the Google Play Developer Distribution Agreement, and pay a $25 fee.  SAC ¶ 53.  Google may impose additional requirements, including providing government identification, a credit card under the developer's legal name, bank account information, a physical address, and other contact details.  SAC ¶¶ 53–54.

The payment process between Google and the developers follows a structured timeline. After a consumer makes a purchase, Google waits two hours before charging the Google Account, which serves as a cancellation window.  SAC ¶ 49.  Developer payments are then processed after the fifteenth day of the following month, provided the Google Play Developer has met the minimum payment threshold.  SAC ¶ 58.  This creates a delay of at least fifteen days, "and usually more," between the date of purchase and the date the developer receives payment.  SAC ¶ 58.

United States District Court
Northern District of California

Google further reserves the right to withhold payments if an in-app purchase was the product of fraud or a scam.  SAC ¶¶ 103–05.

### 2.     Google Play Gift Cards

Google offers prepaid Google Play gift cards that allow consumers to make purchases in the "Google Play ecosystem."  SAC ¶¶ 22–23.  Each Google Play gift card has a unique redemption code that remains dormant until activated at the point of sale.  SAC ¶¶ 25–27.  Through data it collects, Google "knows" the moment of purchase, the stored value that is activated, the retail location at which the card was purchased, and the redemption of other cards purchased at that location or at roughly the same time.  SAC ¶ 28.

To use gift cards, consumers must have a valid Google Account.  SAC ¶ 33.  When redeeming the Google Play gift cards, consumers log into their Google Account and enter the Google Play gift card's redemption code, which transfers the stored value to their Google Account for immediate use.  SAC ¶ 40.  Once redeemed, the physical card no longer holds any value.  SAC ¶ 42.  Google maintains detailed tracking of all redemption codes and serial numbers of Google Play gift cards, each redemption, and the corresponding Google Account.  SAC ¶ 43.

The Google Play gift cards come with basic terms and conditions on their packaging:

> **Terms and Conditions:** See play.google.com/us-card-terms for full terms.  Must be 13+ years of age, US resident.  Google Play card is issued by Google Arizona LLC ("GAZ").  Requires Google Payments account and Internet access to redeem.  Redeemed balance is maintained by GAZ's affiliate, Google Payment Corp. ("GPC"), in your Google Payments account.  Usable for purchases of eligible items on Google Play only.  Not useable for hardware and certain subscriptions.  Other limits may apply.  No fees or expiration dates.  Except as required by law, card is not redeemable for cash or other cards; not reloadable or refundable; cannot be combined with other non-Google Play balances in your Google Payments account, resold, exchanged or transferred for value.  User responsible for loss of card.  For assistance or to view your Google Play card balance, visit support.google.com/googleplay/go/cardhelp.  To speak to customer care call us at 1-855-466-4438.

SAC ¶ 30.  The full terms and conditions for Google Play gift cards (the "Terms and Conditions") are available online.  SAC ¶ 31.

On the gift card packaging, Google instructs purchasers to "[o]nly use this gift card's code on Google Play" and that "[a]ny other request for the code may be a scam."  SAC ¶ 145.  Plaintiffs

United States District Court
Northern District of California

characterize this as an "ineffective warning," SAC ¶ 145, especially in light of Google's knowledge that scammers often deceive consumers by creating artificial urgency and presenting gift cards as the only payment option, SAC ¶¶ 70–71.

### 3.    Google Play Gift Card Scams

The Federal Trade Commission reported $433.5 million in total gift card scams from 2018 to 2021, a figure that accounts for only a "fraction" of actual cases, given that many consumers either do not know how to report scams or choose not to.  SAC ¶¶ 63–66.  If only 10% of scam losses were reported to the Commission, a "generous estimate," the total amount of money stolen through Google Play gift card scams exceeded $220 million in 2021.  SAC ¶ 66.

Plaintiffs allege that Google Play gift card scams tend to follow a pattern.  To begin, scammers convince victims to purchase Google Play gift cards to pay for something outside of the Google Play Store.  SAC ¶ 70.  For instance, a scammer may impersonate an agent from a government agency (e.g., the Internal Revenue Service) and demand payment to avoid trouble, such as arrest or the seizure of property.  SAC ¶ 70.  Once the scammer has successfully convinced the victim to buy a Google Play gift card, he will pressure the victim to reveal its redemption code and purchase more Google Play gift cards.  SAC ¶ 73.  The scammer then redeems the Google Play gift cards and transfers the stored value into a scammer-controlled Google Account.  SAC ¶ 74.  The scammer then spends the redeemed value by purchasing apps or making in-app purchases on the Google Play Store and monetizes the funds by selling those items on third-party markets.  SAC ¶ 75.

Google has built and employs algorithms to detect whether a gift card is being redeemed or used by a scammer.  SAC ¶¶ 81, 88.  These algorithms incorporate data such as the dates, times, and locations of both the gift card's purchase and redemption; the amount of the gift card; whether it was purchased with other gift cards; and the identity of the redeeming Google Account.  SAC ¶¶ 89–91.  The algorithms also incorporate data from when the scammer makes a purchase using funds redeemed from a gift card, such as the purchase's timing and cost, other digital products being purchased around the same time, and the interval between the purchase of the gift card, the redemption of the funds, and the purchase of the digital product.  SAC ¶¶ 90–91.

4

Plaintiffs allege that despite Google's awareness of the pervasive scams, Google imposes a "no refund" policy on its Google Play gift cards. SAC ¶¶ 118, 140. When victims of scams contact Google for a refund of their Google Play gift cards, they are frequently advised that "it is unable to refund" the money and "conceals" the fact that the money is either in, or will soon be in, Google's possession or control. SAC ¶ 116–18.

### 4. Judy May

In April 2021, Ms. May fell victim to a gift card scam involving Google Play gift cards. SAC ¶ 9. The scam began when Ms. May received a message from someone posing as a family member, directing her to contact a supposed government agent about grant money from the U.S. Department of Health and Human Services ("HHS"). SAC ¶ 152. The scammer, pretending to be a government agent, told Ms. May that she was eligible for an HHS grant but needed to cover certain costs up front to receive same-day delivery of the grant money. SAC ¶ 153. Ms. May was instructed to purchase Google Play gift cards and provide the codes on the back of the cards to cover those alleged costs, with the promise of reimbursement. SAC ¶ 153.

On April 1, 2021, Ms. May bought a $200 gift card from Family Dollar in Connersville, Indiana, and shared the code with the scammer. SAC ¶ 155. The next day, she purchased four more $200 gift cards from a CVS Pharmacy in Connersville, Indiana, and again shared the codes with the scammer. SAC ¶ 156. Although Ms. May read the language on the gift cards, she was unaware of the nature and prevalence of Google Play gift card scams and did not realize she was being scammed. SAC ¶ 157. She realized she had been scammed only after contacting her relative about the supposed government agent and learning that the person she had been communicating with on Facebook Messenger was not legitimate. SAC ¶ 158. On April 3, 2021, Ms. May contacted Google and explained that she had been the victim of a Google Play gift card scam. SAC ¶ 159. After a week of back-and-forth, Ms. May received an email from Google, which explained that the complaint had been "handled according to our current policy and there's nothing further we can do[]" because "Google is unable to refund gift cards that have been redeemed by others or were purchased as part of a scam." SAC ¶ 164 (internal quotation marks omitted).

5

### 5.    Maureen Kennedy

Ms. Kennedy received an email on January 24, 2022, from a scammer posing as a friend who needed money for a birthday present.  SAC ¶ 181. Ms. Kennedy purchased two $100 Google Play gift cards and provided the codes to the scammer.  SAC ¶ 183.  Three days later, she purchased two $150 Google Play gift cards and provided the codes to the scammer.  SAC ¶ 184.  Like May, Ms. Kennedy read the warning on the Google Play gift card but did not appreciate the nature of the Google Play gift card scams.  SAC ¶ 185.  Upon realizing that the person she had been communicating with was a scammer, Ms. Kennedy contacted Google and provided "everything Google needed" to confirm that she was the victim of a scam.  SAC ¶ 188.  Nonetheless, Google explained that the funds and been spent and there was "nothing it could do."  SAC ¶ 189.

### 6.    Joan Ehly

On December 15, 2021, Ms. Ehly received an email from a scammer posing as an Amazon order confirmation for a $560.77 purchase.  Ms. Ehly called the customer service number and was connected to a person posing as an Amazon employee.  SAC ¶ 209.  The scammer instructed Ms. Ehly to purchase $400 worth of Google Play gift cards "to receive a refund" for the Amazon charge.  SAC ¶ 210.  She purchased two gift cards in Havertown, Pennsylvania, and provided the redemption codes to the scammer.  SAC ¶ 211.  She read the warning on the gift card but did not understand the nature of Google Play gift card scams.  SAC ¶ 212.  Only after she contacted her bank to confirm that she had received a refund did Ms. Ehly learn that she had been the victim of a scam.  SAC ¶ 212.  Ms. Ehly did not contact Google to report the scam and instead reported the incident to the Havertown Township Police Department.  SAC ¶ 218.

## B.  Procedural History

May filed this action on March 5, 2024.  ECF No. 1.  The Court granted a motion to dismiss on November 4, 2024.  ECF No. 87 ("Prior Order").  Ms. May then filed her First Amended Complaint.  ECF No. 93 ("FAC").  Before Google responded to the FAC, counsel for Plaintiffs filed a Suggestion of Death.  ECF No. 96.  Plaintiffs subsequently filed a motion for substitution, intervention, and leave to amend.  ECF No. 104.  The Court allowed Denver May,

6

Ms. May's successor-in-interest, to substitute as a named plaintiff. ECF No. 113. The Court also permitted Ms. Kennedy and Ms. Ehly to intervene as putative class representatives. ECF No. 113. Plaintiffs filed the SAC on July 17, 2025.

## II.    LEGAL STANDARD

### A.  Motion to Dismiss

Dismissal of a complaint is appropriate under Rule 12(b)(6) "if the complaint fails to state a cognizable legal theory or fails to provide sufficient facts to support a claim." *Sinclair v. City of Seattle*, 61 F.4th 674, 678 (9th Cir. 2023). When considering a Rule 12(b)(6) motion, a court must "take all allegations of fact as true and construe them in the light most favorable to the nonmoving party." *Id*. While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir. 2001), *amended on other grounds,* 275 F.3d 1187 (9th Cir. 2001)).

### B.  Motion to Strike

Under Rule 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Where the complaint demonstrates that a class action cannot be maintained on the facts alleged, a defendant may move to strike class allegations prior to discovery." *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 990 (N.D. Cal. 2009).

### C.  Leave to Amend

In deciding whether to grant leave to amend, the Court must consider the factors set forth by the Supreme Court in *Foman v. Davis*, 371 U.S. 178 (1962), and discussed at length by the Ninth Circuit in *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2003). A district court ordinarily must grant leave to amend unless one or more of the *Foman* factors is present:

United States District Court
Northern District of California

7

(1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by amendment, (4) undue prejudice to the opposing party, or (5) futility of amendment. *Id.* at 1052. "[I]t is the consideration of prejudice to the opposing party that carries the greatest weight." *Id.* However, a strong showing with respect to one of the other factors may warrant denial of leave to amend. *See id.*

## III.    REQUEST FOR INCORPORATION BY REFERENCE

Google requests the Court consider four exhibits to the motion incorporated by reference on the ground that they are referred to, quoted from, or relied upon in the SAC. Mot. at 24. Exhibits A and B are copies of the Google Play gift card and packaging as they would have appeared when Plaintiffs purchased Google Play gift cards in April 2021 (Ms. May), December 2021 (Ms. Ehly), and January 2022 (Ms. Kennedy). *See* SAC ¶¶ 9–11. Exhibit C is the Google Play Gift Card and Prepaid Play Balance Terms of Service (May 1, 2019), publicly available at https://play.google/intl/en_us/card-terms/. Exhibit D is the Facebook Messenger chat history between Ms. May and the scammer. Plaintiffs object to Google's request to incorporate Exhibit D because the "SAC does not reference or rely on the Facebook messages," nor "are they central to Plaintiffs' claims." Opp. at 25. Plaintiffs do not object to Google's other requests.

"Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). The Court disagrees with Plaintiffs' contention that the SAC does not reference or rely on Ms. May's messaging history with the alleged scammer. To the contrary, the SAC describes the chat history in some detail. *See, e.g.*, SAC ¶ 152 ("The scammer told Plaintiff May that in order to receive her grant money by same-day delivery, she had to cover certain costs, which would be reimbursed to her as part of the grant money. The scammer instructed Plaintiff May to purchase Google Play gift cards which she understood were to be used to cover the costs to obtain the HHS grant money."). The Court GRANTS Google's request to take judicial notice of Exhibits A, B, C, and D.

United States District Court
Northern District of California

## IV.   DISCUSSION

In its motion, Google argues that the SAC should be dismissed because the limitation of liability provision in the Terms of Service is a complete defense, and no cause of action is sufficiently pled.  Google also seeks to strike the class definition because it extends past the applicable statutes of limitations and is overbroad.  Plaintiffs urge that the limitation of liability clause is unenforceable because Google may not disclaim liability for its own misconduct.  Plaintiffs further argue that the SAC states facts sufficient to allege each cause of action, tolling extends the statutes of limitations, and the class definition is appropriate.

### A.  Limitation of Liability

Google argues that the limitation of liability provision on the Google Play gift card packaging shields it from liability for third-party misconduct.  Mot. at 5–7.  In opposition, Plaintiffs contend that the limitation of liability defense fails because the SAC adds factual allegations demonstrating that Google's liability disclaimer is unconscionable and therefore unenforceable.  Opp. at 2–6.  Plaintiffs further urge that the limitation of liability provision is void ab initio because it is contrary to public policy as codified in California Civil Code § 1668.  Opp. at 6.

Under California law, limitation of liability provisions are enforceable unless they are unconscionable.  *Barrett v. Apple Inc.*, No. 20-cv-04812-EJD, 2022 WL 2119131, at *12 (N.D. Cal. June 13, 2022).  The Terms and Conditions provide:

> **Limitations**.  The Gift Card or Credit may be used for purchases of eligible items on Google Play only. Limits may apply to redemption and use.  Items ineligible for purchase using Gift Card or Credit include certain items in the "Devices" section of Google Play (e.g., phones, tablets and related device accessories) . . . .  The Gift Card or Credit is not redeemable for cash or other cards, is not reloadable or refundable, cannot be combined by you with other non-Google Play balances in your Google Payments account, and cannot be resold, exchanged or transferred for value, except as required by law. . . .
>
> * * *
>
> **Fraud**.  [Google is] not responsible if a Gift Card or Credit is lost, stolen, destroyed or used without your permission.  [Google] will have the right to close customer accounts and bill alternative forms of payment if a fraudulently obtained Gift Card or Credit is redeemed and/or used to make purchases on Google Play.
>
> * * *

> **General Terms**. . .  When you purchase, receive or redeem a Gift Card or Credit, you agree that the laws of the State of California apply, without regard to principles of conflict of laws, and that such laws will govern these Gift Card and Credit terms and conditions.

SAC ¶ 31 (alterations in original).

In the Prior Order, the Court explained that under a "plain reading" of the Google Play gift card's Terms and Conditions, Google is shielded from liability for third party misconduct unless Plaintiffs can show the Terms and Conditions are unenforceable due to unconscionability.  Prior Order at 10–13.  The Court also found that Google did not attempt to exculpate itself from its own misconduct because the complaint had not alleged wrongful conduct attributable to Google.  Prior Order at 13.  The Court dismissed with leave to amend because it found that Plaintiffs had not alleged facts demonstrating unconscionability.  Prior Order at 10–13.  In reviewing Google's motion to dismiss the SAC, the Court accordingly first considers whether Plaintiffs have sufficiently amended the complaint to allege unconscionability.

### 1.    Unconscionability

Google urges that Plaintiffs have still not pled "the oppression or surprise" required to show procedural unconscionability and "fare no better in attempting to replead substantive unconscionability."  Mot. at 6–7.  Plaintiffs contend that their new allegations are sufficient to demonstrate unconscionability.  Opp. at 3–6.

"Under California law, a contract provision is unenforceable due to unconscionability only if it is both procedurally and substantively unconscionable."  *Shroyer v. New Cingular Wireless Servs., Inc.*, 498 F.3d 976, 981 (9th Cir. 2007).  Although both forms of unconscionability must be present, "they need not be present in the same degree."  *Sanchez v. Valencia Holding Co.*, 61 Cal. 4th 899, 910 (2015) (quoting *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000)).  "[T]he more substantively oppressive a contract term, the less procedurally unconscionable it must be to be deemed unenforceable, and vice versa."  *Id.* (quoting *Armendariz*, 24 Cal. 4th at 114).  The unconscionability inquiry is dependent on context and requires evaluation of the commercial setting, purpose, and effect of the contract.  *Chen v. PayPal, Inc.*, 61 Cal. App. 5th 559, 579 (2021).

### a. Procedural Unconscionability

Google argues that Plaintiffs' new allegations are not sufficient to plead the oppression or surprise required for procedural unconscionability. Mot. at 6–7. Plaintiffs urge that the Terms and Conditions amount to a non-negotiable contract of adhesion and that the "unique" circumstances of the scam "amplif[y]" the oppression. Opp. at 3–5.

"The procedural element of unconscionability focuses on two factors: oppression and surprise." *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1139 (N.D. Cal. 2010) (quoting *Aron v. U-Haul Co. of Cal.*, 143 Cal. App. 4th 796, 808 (2006)). In order to establish oppression, Plaintiffs must allege facts showing "an inequality of bargaining power which results in no real negotiation and an absence of meaningful choice." *Id.* (quoting *Aron*, 143 Cal. App. 4th at 808). "[A]ny claim of 'oppression' may be defeated if the complaining party had reasonably available alternative sources of supply from which to obtain the desired goods or services free of the terms claimed to be unconscionable." *Id.* (quoting *Dean Witter Reynolds, Inc. v. Sup. Ct.,* 211 Cal. App. 3d 758, 768 (1989)).

In the Prior Order, the Court found that there were no alleged facts supporting oppression. Although the terms were not bargained for, Ms. May had not alleged having lacked a reasonably available alternative. Prior Order at 12. Moreover, pressure from scammers did not amount to conduct attributable to Google. Prior Order at 12. Nor had Ms. May alleged surprise—to the contrary, she alleged having reviewed the language on the gift cards that she purchased, including the scam warning. Prior Order at 12–13.

In response to the prior order, Plaintiffs have added allegations claiming (1) Google's knowledge that scammers create a sense of urgency in victims, SAC ¶ 71; (2) scam victims have "no independent intent or desire to purchase gift cards, nor do they intend to use them for recreational purposes in the Google Play Store," SAC ¶ 72; and (3) Google includes only an "anemic warning" on the gift cards, SAC ¶ 147. Plaintiffs argue that they "allege facts from which a plausible conclusion may be drawn that Google plays a role in the lack of meaningful choice for scam victims," because Google is aware that scammers direct their victims to Google Play gift cards yet provides only what Plaintiffs characterize as "tepid and incomplete" warning

United States District Court
Northern District of California

11

United States District Court
Northern District of California

language.  Opp. at 5 (citing SAC ¶¶ 70, 71, 147).  Moreover, Plaintiffs argue that the Terms and Conditions are offered on a take-it-or-leave-it basis makes them a contract of adhesion.  Opp. at 5 (citing SAC ¶¶ 138–41).  Plaintiffs argue that there is "procedural unconscionability inherent to all contracts of adhesion," and the "unique circumstances in which scam victims entered into Google's terms and conditions amplifies the oppression."  Opp. at 4.

The Court finds that Plaintiffs have pled, at most, a small amount of procedural unconscionability, but based only on the non-negotiability of the Terms and Conditions.  *See* SAC ¶ 141 (describing the adhesive nature of the Terms and Conditions).  The Court acknowledges that there is some split authority as to whether the mere fact that a contract is adhesive is sufficient to give rise to procedural unconscionability.  *Compare Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1253–54 (N.D. Cal. 2022) (noting that the defendant's offering terms on a take-it-or-leave-it basis without an opportunity to negotiate is enough to give rise to some procedural unconscionability), *with George v. eBay, Inc.*, 71 Cal. App. 5th 620, 632 (2021) ("Merely alleging that a contract is one of adhesion was insufficient in these circumstances to show procedural unconscionability.").  But, as a general rule, "courts consider adhesive contracts—standardized contracts in which the party with lesser bargaining power lacked an opportunity to negotiate—procedurally unconscionable to some degree."  *Mikhak v. Univ. of Phoenix*, No. 16-cv-00901-CRB, 2016 WL 3401763, at *8 (N.D. Cal. June 21, 2016).  The Court accordingly finds that the contract carries a small amount of procedural unconscionability as a consequence of its non-negotiability.

Plaintiffs' other arguments with respect to oppression and surprise, on the other hand, are unavailing.  To begin, Plaintiffs again fail to allege facts demonstrating that pressure created by a third party gives rise to oppression attributable to Google.  The allegations make clear that it is the scammers alone who pressure the victims.  *See, e.g.*, SAC ¶ 71 ("Google knows that scammers instill a sense of urgency in their victims.").  While Plaintiffs conclusorily allege that Google plays a "role" in the scams, SAC ¶ 141, the SAC contains no factual allegations that plausibly support this conclusion.  Google's awareness of the existence and nature of scams, *see* SAC ¶¶ 140–43, does not lead to a reasonable inference that Google is a meaningful *participant* in the scams.

Accordingly, Plaintiffs' reliance on the Ninth Circuit's decision in *Ronderos v. USF Reddaway, Inc.*, 114. F.4th 1080 (9th Cir. 2024), to demonstrate that "the unique circumstances in which scam victims entered into Google's terms and conditions amplifies the oppression" is misplaced. *See* Opp. at 4 (citing *Ronderos*, 114 F.4th at 1090). In *Ronderos*, pressure on the plaintiff to sign an agreement was exerted by the more powerful counterparty to the contract. *See* 114 F.4th at 1090. The employer "pushed" the plaintiff to "sign the contract immediately, on site." *Id.*; *see also Mikhak*, 2016 WL 3401763, at *10 (finding that an "adhesive agreement" had a "slightly oppressive nature" due to pressure placed by an employer on an employee to accept an arbitration agreement). While pressure exerted on the party to enter into the contract can give rise to oppression, *see, e.g.*, *OTO LLC v. Koh*, 8 Cal. 5th 111, 127 (2019), here, Plaintiffs argue that their agreement with Google is procedurally unconscionable due to pressure exerted by scammers, who are strangers to the contract. The cases Plaintiffs cite are therefore distinguishable because in *Ronderos* and *Mikhak*, the pressure to enter into the contracts was exerted by the defendants, i.e., the counterparties to the contract. Here, by contrast, the pressure exerted on Plaintiffs to enter the Terms and Conditions came from third-party scammers. Google was not involved with or aware of any urgency experienced by the Plaintiffs at the time the gift cards were purchased, so creation of that urgency cannot be attributed to Google. Moreover, from Google's perspective, there was no time limit on Plaintiffs' redeeming the gift cards once purchased, as detailed in the Terms and Conditions. *See* SAC ¶ 30 ("No fees or expiration dates.").

Plaintiffs also allege that the contract is procedurally unconscionable because they faced an absence of choice in purchasing the gift cards. *See, e.g.*, SAC ¶ 142 ("Scammers convince victims that these payments . . . must be paid in Google Play gift cards). For one thing, as Google correctly points out, the Plaintiffs could have chosen to forgo the purchase altogether after reading the warning on the gift cards. Reply at 3 (citing SAC ¶¶ 157, 185, 212). For another, Plaintiffs' assertion is contradicted by Ms. May's messages with the scammer, who instructed her to purchase *either* a Google Play gift card *or* a Sephora gift card. Mot. Ex. D. at 31. Ms. May had a set of options. Although the existence of alternatives does not necessarily bar a finding of procedural unconscionability, *see Shroyer*, 498 F.3d at 985, such alternatives nonetheless

United States District Court
Northern District of California

"weaken" claims of procedural unconscionability, *see In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 313 F. Supp. 3d 1113, 1137 (N.D. Cal. 2018).

Finally, that Ms. May and Ms. Kennedy contacted Google in the aftermath of the scam, *see* SAC ¶¶ 159–60, 188, does not support a reasonable inference of surprise. Plaintiffs do not allege that the terms or warnings were hidden. Instead, Plaintiffs again allege that they reviewed the gift card terms at the time of purchase. SAC ¶¶ 157, 185, 212. This undermines any plausible claim of surprise. *See Barrett*, 2022 WL 2119131, at *13 ("Plaintiffs do not argue surprise—nor could they, given that they plead that each of them read the card packaging displaying the disclaimer prior to purchase.").

In sum, the contract is only adhesive because Plaintiffs had no opportunity to negotiate the terms of the limitation of liability provision, SAC ¶¶ 138–41, so the Terms and Conditions carry at most a small degree of procedural unconscionability. *See Meta Platforms*, 605 F. Supp. 3d at 1253–54. The Court is not persuaded that the allegations in the SAC otherwise give rise to a reasonable inference of oppression or surprise. Given the sliding-scale nature of the analysis, Plaintiffs must allege a significant amount of substantive unconscionability to render the limitation of liability clause unenforceable in light of the thin allegations of procedural unconscionability. *Cf. Serafin v. Balco Properties Ltd.*, 235 Cal. App. 4th 165, 178 (2015) ("[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (citation omitted)).

### b. Substantive Unconscionability

Google argues that Plaintiffs have not pled substantive unconscionability because the Terms and Conditions govern a nonessential activity, the terms are not so one-sided as to shock the conscience, and Plaintiffs do not allege any misconduct by Google. Mot. at 7. Plaintiffs respond that Google's attempt to cut off liability for "knowingly retaining and profiting from victims' stolen property" amounts to substantive unconscionability. Opp. at 5.

"Courts in California have used various standards for determining when an agreement is substantively unconscionable such as where the agreement is 'overly harsh,' 'unduly oppressive,' 'unreasonably favorable,' or 'shock[s] the conscience.'" *Keebaugh v. Warner Bros. Ent. Inc.*,

14

100 F. 4th 1005, 1022 (9th Cir. 2024) (alteration in original) (quoting *Sanchez*, 61 Cal. 4th at 911–13). "All of these formulations point to the central idea that unconscionability doctrine is concerned not with 'a simple old-fashioned bad bargain,' but with terms that are 'unreasonably favorable to the more powerful party.'" *Sanchez*, 61 Cal. 4th at 911 (citations omitted) (first quoting *Schnuerle v. Insight Comm'cns Co.*, 376 S.W.3d 561, 575 (Ky. 2012); then quoting 8 Williston on Contracts § 18.10 (4th ed. 2010)) . In sum, substantive unconscionability is a high bar because "[u]nconscionable terms 'impair the integrity of the bargaining process or otherwise contravene the public interest or public policy' or attempt to impermissibly alter fundamental legal duties." *OTO*, 8 Cal. 5th at 130 (quoting *Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal. 4th 1109, 1145 (2013)).

Furthermore, a valid commercial justification for a limitation of liability clause may undermine a charge of substantive unconscionability. For example, in *Darnaa, LLC v. Google Inc.*, No. 15-cv-03221-RMW, 2015 WL 7753406 (N.D. Cal. Dec. 2, 2015), a court in this district found that YouTube's limitation of liability clause was not substantively unconscionable. *Id.* at *3. There, the court reasoned that because YouTube "offers its hosting services at no charge, it is reasonable for YouTube to retain broad discretion over those services and to minimize its exposure to monetary damages." *Id.*; *accord Lewis v. YouTube, LLC*, 244 Cal. App. 4th 118, 224 (2015) (upholding YouTube's limitation of liability clause because such "clauses are appropriate when one party is offering a service for free to the public").

The Court previously held that the Terms and Conditions were not substantively unconscionable because they involved "entertainment services on Google Play," which is a "nonessential recreational activity." Prior Order at 13 (quoting *Lum v. Merlin Ents. Grp. U.S. Holdings Inc.*, No. 20-cv-01049-JAH-MSB, 2023 WL 2583307, at *12 (S.D. Cal. Mar. 20, 2023)). The terms also did not produce "overly harsh or one-sided results." Prior Order at 13 (quoting *Herskowitz v. Apple Inc.*, 940 F. Supp. 2d 1131, 1144 (N.D. Cal. 2013)).

Plaintiffs have not alleged any additional facts showing that the limitation of liability clause is substantively unconscionable as it relates to the conduct of third-party scammers. They do not dispute that the Google Play Store is a purely recreational entertainment platform, to which

15

Google charges consumers no direct cost for access. *See* SAC ¶¶ 20–21 (describing the nature of the Google Play Store); Tr. at 56:12–13 (explaining that the purchase of the gift card is at face value). To the extent the limitation of liability clause disclaims liability for the scammers' misconduct, it is not substantively unconscionable, and Plaintiffs do not argue otherwise.

Instead, Plaintiffs contend that the contract is substantively unconscionable because the terms improperly seek to limit Google's liability for knowingly retaining and profiting from victims' stolen property. Opp. at 5–6. Google argues that courts routinely uphold limitation of liability provisions like the one at issue here and that Plaintiffs' "conclusory allegations" do not support the argument that Google applies its limitation of liability provision to shield its own misconduct. Mot. at 5–6; *see also* Reply at 3.

In support of their contention that Google's limitation of liability clause seeks to insulate Google from its own misconduct, Plaintiffs rely on *Barrett*, which also involved gift card scams. Opp. at 5 (citing *Barrett*, 2022 WL 2119131 at *12). There, the court explained that Apple's liability disclaimer did not shield the company from "liability for [its] own conduct as to withholding or concealing stolen property and conversion." *Barrett*, 2022 WL 2119131, at *12. The *Barrett* court found that the plaintiffs had stated claims for violation of California Penal Code § 496 and conversion because the "scammers spen[t] the value on or within an app" controlled by the scammers themselves. *Id.* at *2. In other words, in *Barrett*, Apple acted as a throughway for the scammers to pay themselves. *Barrett* is thus distinguishable, since Apple's limitation of liability clause was found to be unconscionable insofar as it sought to insulate Apple from its own misconduct. Here, there are no similar allegations showing that the at-issue funds stay in the scammers' Google Play Accounts once the gift cards are redeemed or are in developer accounts controlled by scammers. Instead, it is equally plausible that the gift card value in this case was spent on apps controlled by innocent developers who were entitled to receive payment for the products they delivered. The SAC does not specify the destination of the at-issue funds.

While the Court agrees that it would be substantively unconscionable (and, as the Court will discuss in detail, a violation of California Civil Code § 1668) for Google to disclaim liability for its own misconduct as in *Barrett*, here, Plaintiffs have not alleged misconduct attributable to

United States District Court
Northern District of California

Google. At the behest of the scammers, Plaintiffs purchased gift cards at face value after reviewing the warning on the cards. SAC ¶¶ 154–57 (Ms. May), 182–85 (Ms. Kennedy), 210–12 (Ms. Ehly). Again at the behest of the scammers, Plaintiffs shared their redemption codes. SAC ¶¶ 155–56 (Ms. May), 183–84 (Ms. Kennedy), 211 (Ms. Ehly). Plaintiffs do not allege that Google *caused* them to buy gift cards and share the codes with the scammers or that Google actively facilitated the scammers' efforts to place money in their own pockets. Accordingly, Google's limitation of liability clause, which states that Google is "not responsible if a Gift Card or Credit is lost, stolen, destroyed or used without [the purchaser's] permission," does not seek to disclaim liability for Google's wrongful conduct—it merely limits Google's liability for conduct of third parties and circumstances that Google is neither aware of nor involved in. *See* SAC ¶ 31. The limitation of liability provision and no-refund policy are reasonable, especially given that Google offers access to the Google Play ecosystem for free. As a consequence, Google has a valid commercial need to limit its liability in connection with the Google Play platform. *See Darnaa*, 2015 WL 7753406, at *3.

Finally, at the hearing, Plaintiffs argued that the limitation of liability clause should be evaluated in light of the particular nature of the contractual relationship, and thus from the vantage point of a consumer who has been scammed. Tr. at 42:19–20 ("Our theory is that [the contract is] unconscionable as applied to this case."). When pressed by the Court, however, Plaintiffs identified no authority showing that a limitation of liability clause may be unconscionable as to certain transactions or individuals, *see* Tr. at 42:21–25, and the Court is not aware of any. Instead, the limitation of liability provision must be evaluated in the context of all of the transactions to which it applies. *See George*, 71 Cal. App. 5th at 631 (contrasting a user agreement for an e-commerce website, which was not unconscionable, to employment-related contracts and a contract signed by a plaintiff seeking medical care, which were). Here, the backdrop for the limitation of liability provision is the Google Play ecosystem, a recreational online setting in which an enormous number of gift cards are sold in an endless variety of retail stores and from Google. All users—including the scam victims—are treated identically and are offered an identical contract. As in *Darnaa*, "Plaintiff[s] ha[ve] not pointed to any shocking unfairness in these provisions."

17

United States District Court
Northern District of California

*Darnaa*, 2015 WL 7753406, at \*3.  Plaintiffs got exactly what they bargained for.

The Court concludes that Plaintiffs have not demonstrated that the limitation of liability provision is overly harsh or one-sided, so it is not substantively unconscionable.

\*     \*     \*

In sum, the Court finds that, even assuming some procedural unconscionability due to the adhesive nature of the contract, any substantive unconscionability pled does not balance the sliding scale where procedural unconscionability is vanishingly small.  Plaintiffs have not alleged sufficient facts to demonstrate that the limitation of liability clause is unconscionable.

The analysis of the enforceability of the limitation of liability clause does not end there, however.  As the Court explained in its Prior Order, and as Plaintiffs argue, the provision is unenforceable to the extent it insulates Google from claims stemming from Google's own misconduct.  *See* Prior Order at 13 (citing *Barrett*, 2022 WL 2119131, at \*14).  Thus, the Court will consider whether Plaintiffs have pled misconduct attributable to Google.

### 2.    California Civil Code § 1668

Plaintiffs argue that even if the Terms and Conditions are not unconscionable, the limitation of liability clause cannot be used to shield Google's own misconduct under California Civil Code § 1668 and is accordingly void ab initio.  Opp. at 6.  Google responds that this argument fails because Plaintiffs have not alleged any misconduct on the part of Google.  Reply at 4.

California Civil Code § 1668 ("§ 1668") provides that "[a]ll contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."  "The rule that parties may not contract away liability for willful injury is well established and widely recognized."  *New England Country Foods, LLC v. VanLaw Food Prods., Inc.*, 17 Cal. 5th 703, 711 (2025).  "Provisions exculpating all liability for 'intentional wrongdoing' and 'gross negligence' are invalid under Section 1668."  *New England Country Foods, LLC v. Vanlaw Food Prods., Inc.*, 87 F.4th 1016, 1020 (9th Cir. 2023) (citing *Westlake Cmty. Hosp. v. Superior Ct.*, 17 Cal. 3d 465, 479 (1976); *City of Santa Barbara*

18

*v. Superior Ct.*, 41 Cal. 4th 747, 751 (2007)).

For example, a court in this district recently found that a limitation of liability provision did not shield the defendant from claims for breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment. *See Isgur v. Meta Platforms*, No. 24-cv-06559-WHO, 2026 WL 194640, at *6 (N.D. Cal. Jan. 26, 2026). There, the court explained that, under § 1668, a limitation of liability clause cannot insulate the defendant from intentional and knowing conduct. *See id.* The defendant's conduct in *Isgur* included taking intentional steps that knowingly resulted in user account-takeovers by third-party hackers from which the defendant would be able to profit and that breached the defendant's own Terms of Service. *Id.* In its discussion of § 1668, the court expressly noted that insofar as the complaint "attempts to allege" that the defendant is liable under its terms of service for the behavior of a third party or is "responsible for immediately remedying third party behavior, such claims are not actionable." *Id.* That distinction highlights the heart of the issue here, namely whether Google attempts to disclaim liability for its own misconduct. *See also Darnaa, LLC v. Google Inc.*, 236 F. Supp. 3d 1116, 1225 (N.D. Cal. 2017) (collecting cases showing that § 1668 "could invalidate a limitation-of-liability clause as applied to a contract claim if it insulated the contractor from its own fraud").

In the prior round of motion to dismiss briefing, Ms. May argued that the claims "do not sound in fraud, but instead arise from unfair and unlawful conduct independent of fraud." ECF No. 45 at 11; *see also* Opp. at 7. As Google correctly observes, however, "Plaintiffs have conceded they do not allege any fraud on the part of Google." Tr. at 56:17–18. Accordingly, the remaining inquiry under § 1668 is whether Plaintiffs have alleged willful injury. Plaintiffs assert that Google attempts to disclaim liability for its own conduct that causes injury. Plaintiffs argue that "[i]t is not the scammers, but Google, who knowingly diverts, conceals, and withholds victims' funds." Opp. at 6. Google responds that there is "no allegation of willful injury in the SAC." Reply at 4.

Plaintiffs rely extensively on *Barrett* in support of their argument that Google's conduct is wrongful. *See, e.g.*, Opp. at 17. In *Barrett*, the court found that the plaintiffs had stated claims for violation of California Penal Code § 496 and conversion, which "concern[ed] Apple's own

19

conduct, not that of third parties," 2022 WL 2119131, at *12. As a consequence, the court, citing § 1668, held that Apple's liability disclaimer was substantively unconscionable insofar as it sought to disclaim liability for Apple's wrongful conduct. *Id.* The Court is in full agreement that if the SAC stated claims for willful injury, a limitation of liability clause seeking to avoid liability therefrom would be unenforceable as a violation of § 1668. As the Court explains below, Plaintiffs have not stated a claim under California Penal Code § 496, including because they failed to plead the element of criminal intent, which is a higher standard than § 1668's willful-injury standard. However, drawing all reasonable inferences in their favor, the Court cannot find as a matter of law that Ms. May and Ms. Kennedy have failed to state a claim for conversion under a strict liability theory. Although Ms. May and Ms. Kennedy have alleged only the sparest of facts demonstrating misconduct attributable to Google and principally allege strict liability, § 1668 is broader than Google argues. *See New England Country Foods*, 17 Cal. 5th at 709–10. Based on the facts alleged in the SAC, including that Ms. May and Ms. Kennedy contacted Google in the immediate aftermath of the scam and that Google still held the funds at that time, knowing that scams are common, the Court cannot rule as a matter of law that § 1668 does not override the disclaimer of liability. *See Appel v. Boston Nat'l Title Agency*, No. 18-cv-00873-RSH-AHG, 2022 WL 3582776, at *8 (S.D. Cal. Aug. 18, 2022) (holding that under § 1668, a release privilege did not bar a conversion claim); *but see North Star Gas Co. v. Pac. Gas & Elec. Co.*, No. 15-cv-02575-HSG, 2016 WL 5358590, at *16 (N.D. Cal. Sept. 26, 2016) (finding that a claim for conversion did not fall within the scope of § 1668 because it was not an intentional wrong or statutory claim); *Grayson v. 7-Eleven, Inc.*, No. 09-cv-01353-GPC-WMC, 2013 WL 1187010, at *6 (S.D. Cal. Mar. 21, 2013) (finding that § 1668 did not invalidate a release agreement as to a conversion claim). Accordingly, the adequately pled conversion claim as to Ms. May and Ms. Kennedy is not subject to dismissal at this stage of the proceedings under Google's limitation of liability provision. Recognizing the split of authority in California regarding the application of § 1668 to conversion claims, it will be incumbent upon Plaintiffs to prove conversion under their strict liability theory based on intentional wrongdoing or strict liability for which the "public interest" is implicated under the six factors laid out in *Tunkl v. Regents of University of California*,

20

60 Cal. 2d 92, 98–101 (1963). At this point, Plaintiffs have, by the skinniest margin, met their pleading obligation.

Having found that the limitation of liability clause is not a complete defense at this stage, the Court will evaluate Google's motion to dismiss each cause of action for failure to state a claim.[1]

### B. California Civil Code § 496

The Court turns to the motion to dismiss Plaintiffs' claim for violation of California Penal Code § 496. A § 496 claim can be brought by "[a]ny person who has been injured" by a defendant "who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained." Cal. Penal Code § 496 (a), (c). To state a claim under § 496, Plaintiffs must plead facts sufficient to show (1) possession of stolen property that Google received, withheld, or concealed with (2) actual knowledge that the property was stolen with (3) the requisite criminal intent. *Bell v. Feibush*, 212 Cal. App. 4th 1041, 1044 (2013). "For the purpose of Penal Code § 496(a), stolen property extends to property that has been stolen by conversion or false pretense." *Casamassima v. Cuadra*, No. 20-cv-04071-JSC, 2020 WL 7482214, at *4 (N.D. Cal. Nov. 16, 2020). In the Prior Order, the Court found that Ms. May had failed to adequately plead any of the elements of § 496. *See* Prior Order at 29. Plaintiffs assert that the SAC includes facts sufficient to state a claim. Opp. at 15.

#### 1. Criminal Intent

Starting with the criminal intent element, Google contends that Plaintiffs have not "come anywhere close" to alleging criminal intent on Google's part to receive, retain, withhold, or conceal stolen property. Mot. at 13. Plaintiffs urge that Google's policy of telling scam victims that it cannot refund them while maintaining control of their property gives rise to a plausible

---

[1] The Court does not address the arguments in the order presented by the briefing because the arguments related to California Civil Code § 496 and conversion are relevant to the Court's analysis of the remaining issues

21

inference of criminal intent under § 496.  Opp. at 18–19.  In *Siry Investment, L.P. v. Farkhondehpour*, 13 Cal. 5th 333 (2022), the California Supreme Court explained that with respect to the criminal intent element of § 496, a plaintiff must show that the defendant "acted not innocently or inadvertently, but with careful planning and deliberation reflecting the requisite criminal intent."  *Id.* at 362.

The Court has reviewed the entire SAC to consider allegations—particularly the newly added allegations—that bear on criminal intent on Google's part.  Plaintiffs' theory of criminal intent proceeds in the following way.  Google is generally aware that scams are widespread.  SAC ¶ 68.  In addition, Google has "received a direct benefit from the proliferation of" the gift card scams, including because Google retains a percentage of any purchases in the Google Play Store.  Opp. at 17 (citing SAC ¶¶ 61, 135).  Google thus, according to Plaintiffs, has an incentive for the warning on the gift cards to fail and so has not made the warning stronger to prevent scams.  SAC ¶¶ 143–51.

According to Plaintiffs, after they purchased the gift cards and shared the redemption codes with the scammers, Google had actual knowledge of the gift card scams at issue for two reasons.  First, Google "has built algorithms into the Google Play ecosystem that detect when a Google Play gift card is being redeemed or used by a scammer," and thus it has "actual notice of gift card scams in real-time."  SAC ¶¶ 81–91.  Second, Ms. May and Ms. Kennedy each reported their situations to Google, actions that, they contend, also put Google on actual notice that they claimed they had been scammed.  SAC ¶¶ 159, 188.  (Ms. Ehly did not contact Google for a refund.)

Plaintiffs further allege that once the gift card is "redeemed" into a scammer-controlled Google Account, "Google retains control over any redeemed value," and "Google reserves the right to freeze Google Accounts that it suspects to have been involved in a gift card scam or fraud."  SAC ¶¶ 96–97.  Google also "reserves the right to withhold payments due to any Google Play Developer in the event that any product or portion of a product sold by that Google Play Developer is suspended or barred based on policy violations," such as fraud.  SAC ¶¶ 103–04.  Google's asserted knowledge of the scams and false statement that the stolen value is "out of its hands," despite maintaining control over any value, demonstrates "Google's intent to receive,

22

United States District Court
Northern District of California

retain, conceal, and withhold stolen property." Opp. at 18–19 (citing SAC ¶¶ 116–27, 132, 310, 313). In short, Plaintiffs argue that Google is liable for failing to (1) prevent the scams, (2) intervene after the gift cards were redeemed, or (3) refund Plaintiffs.

In response to the Prior Order, Plaintiffs have added a substantial number of new allegations that bear on Plaintiffs' theory of criminal intent, which the Court summarizes in relevant part. The SAC newly describes Google's fraud-detection algorithms that can identify, in real time, when a Google Play gift card is being redeemed or used by a scammer. SAC ¶¶ 81–88. This fraud-detection algorithm is one of the bases for Plaintiffs' charge that Google has actual knowledge of the specific scams in this case. Plaintiffs further allege that, despite Google's actual knowledge of these scams, its ability to freeze scam-involved Google Accounts at the time of wrongdoing, and its continued control over the stolen funds, Google does not refund the victims and misrepresents that there is nothing more it can do for them. SAC ¶¶ 116–27. Plaintiffs characterize the dovetailing of Google's ability to identify gift card scams, access to systems that can freeze the scams at various stages, right to withhold funds, and statement to consumers that it cannot help them further as a "deliberate policy of concealment." SAC ¶¶ 110–33.

According to Plaintiffs, Google profits from the scams, including because Google retains a 15–30% commission on purchases made in the Google Play Store. SAC ¶¶ 134–37. Plaintiffs newly assert that Google knows that it will sell more gift cards if people are pressured into buying them by scammers but nonetheless provides only what Plaintiffs characterize as an "equivocal" and "anemic" warning. SAC ¶¶ 140–48. The SAC states that because Google profits from these scam-driven gift card sales, it benefits from an ineffective warning. SAC ¶¶ 147–50. Plaintiffs have also added allegations describing Google's knowledge that scammers create a sense of urgency in victims, SAC ¶ 71, and asserting that scam victims have "no independent intent or desire to purchase gift cards, nor do they intend to use them for recreational purposes in the Google Play Store," SAC ¶ 72.

The SAC also includes new details about the technical infrastructure of Google's gift card ecosystem. Plaintiffs' added allegations flesh out how the money from the purchase of the gift cards becomes available to redeem, SAC ¶¶ 22–27, describe the data Google maintains in

connection with Google Play gift cards, SAC ¶¶ 38–52, and identify Google's rights to take control of value, even when the funds have already been spent on an in-app purchase, SAC ¶¶ 94–109.

The Court turns to evaluating whether the allegations in the SAC support a reasonable inference of criminal intent on the part of Google. As an initial matter, the Court disagrees that Plaintiffs have stated facts sufficient to show a reasonable inference of Google's actual knowledge of the specific scams (in contrast to its general knowledge of the existence of scams). *Cf. RSB Vineyards, LLC v. Orsi*, 15 Cal. App. 5th 1089, 1098 (2017) ("[A]ctual knowledge can be inferred from the circumstances only if, in the light of the evidence, such inference is not based on speculation or conjecture. Only where the circumstances are such that the defendant 'must have known' and not 'should have known' will an inference of actual knowledge be permitted." (quoting *Yuzon v. Collins*, 116 Cal. App. 4th 149, 163 (2004)).

Plaintiffs base their charge of actual knowledge in large part on a scam-detecting algorithm that Google has "admitted" to employing. *See*, *e.g.*, Opp. at 15–16 (citing SAC ¶¶ 81–91). For example, Plaintiffs allege that "[u]pon information and belief, Google's gift card fraud algorithms detected, and thus Google had actual knowledge" that Ms. May was scammed. SAC ¶ 166. Plaintiffs' allegation is based on Google's awareness of how gift card scams typically operate, the data Google would have collected when Ms. May was scammed, and Google's "admission" that it has scam-detecting algorithms in place. SAC ¶ 166. But these facts do not give rise to a reasonable inference of actual knowledge. Plaintiffs allege only that Google has an algorithm that *can* detect fraud, not that Google *knew* that the at-issue gift cards were the products of scams. Plaintiffs' own allegations regarding Google's efforts to eliminate fraud make such an inference implausible. *See, e.g.*, SAC ¶ 85 ("Google's deployment of an algorithm-based tool to detect gift card fraud in real-time is consistent with tools deployed by Google in other aspects of its business, including Google's efforts to combat fraud on its advertising platforms."). It would be perverse if Google's scam-detecting algorithm was the basis for a charge of criminal intent. And Plaintiffs' allegation that "even legitimate transactions are alleged to have been caught in [the algorithm's] dragnet," SAC ¶ 88, further undermines Plaintiffs' argument that Google had actual notice. The

SAC itself alleges that the algorithm is an unreliable tool, which makes such an inference even less plausible.  *See* SAC ¶ 88.

Furthermore, Plaintiffs assert that Google had actual knowledge of the scams because Plaintiffs reported them.  Opp. at 17.  The Court disagrees.  Those reports only lead to a reasonable inference of Google's actual knowledge that Plaintiffs said that they were the victims of scams.  SAC ¶¶ 159–60, 188.  Indeed, the SAC does not state that Ms. May and Ms. Kennedy's reports automatically gave Google actual knowledge.  Instead, their communications allegedly "provided everything Google needed to confirm" that they were scam victims.  SAC ¶¶ 160, 188.  Accordingly, Ms. May and Ms. Kennedy's respective reports of scams would give rise to actual knowledge only if Google had a duty to investigate those reports and confirm their accuracy.  *See Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1585 (1995); *TME Enters., Inc., v. Norwest Corp.*, 124 Cal. App. 4th 1021, 1031–32 (2004).  Plaintiffs assert no such duty.  To the contrary, Plaintiffs affirmatively state that "Google investigated and learned of scams in real time—not that it had a duty to do so."  Opp. at 17; *see also* Opp. at 16 (arguing that Google did not fail to investigate, but instead "willfully turned a blind eye" to actual knowledge it already possessed).  Google's actual knowledge of the specific scams at issue is foundational to Plaintiffs' theory of criminal intent.  *See* Opp. at 18 (discussing the importance of actual knowledge to the criminal intent element of the § 496 claim).  Thus, Plaintiffs' failure to allege actual knowledge undermines the § 496 claim.

To the extent Plaintiffs' theory of criminal intent depends on Google's failure to refund Plaintiffs, *see* Opp. at 19, that argument makes too much of Google's ability to pause the flow of value without focusing on the fact that Google has no duty to do so.  Plaintiffs state that Google has a "duty to disclose and not conceal [material facts] from Plaintiffs and Class members."  SAC ¶ 131.  Plaintiffs allege that this duty arises from "(1) [Google's] misrepresentation to consumers that there is nothing Google can do; and (2) [Google's] exclusive knowledge and active concealment of material facts which allow Google to identify all accounts involved in Google Play gift card scams, stop payment to scammers, and return the value of Google Play gift cards to scam victims, which it is still in possession of."  SAC ¶ 131.  This conclusory allegation does not give

25

rise to a reasonable inference of a duty.  First, an allegation of Google's "active concealment" or "misrepresentation" depends on Google's actual knowledge of the specific scams at issue, which, as discussed above, is not a reasonable inference that can be drawn from the allegations contained in the SAC.  Google's general awareness that scams are widespread and use of tools designed to detect fraud does not give rise to a reasonable inference of actual knowledge.  Second, Plaintiffs' allegation of duty to act is circular.  Plaintiffs allege a duty to disclose arising from Google's misrepresentation and concealment, which are allegations that would be actionable only if there were a legal duty to disclose information.  Plaintiffs do not identify one.  Third, to the extent Plaintiffs allege that Google misrepresented that there was nothing more it could do, Plaintiffs do not allege that the misrepresentation was material or that Plaintiffs reasonably relied thereon.  The Court finds that Plaintiffs' attempt to manufacture a duty to act in this circumstance is unavailing.  After all, the scam was completed, and Plaintiffs were asking Google for what would amount to an exception to the no-refund policy.  *Barrett*, 2022 WL 2119131, at *10–11.  Accordingly, the Court concludes that Google's adherence to its standard, disclosed policy against issuing refunds cannot transform Google's refusal to freeze and return funds into an illustration of criminal intent on Google's part.

Finally, the allegations regarding Google's effort to root out fraud make other allegations regarding criminal intent implausible.  *See, e.g.*, SAC ¶ 81 (describing Google's development of the algorithms that can detect when a Google Play gift card is being redeemed or used by a scammer); SAC ¶ 83 (describing Google's announcement of additional, "real-time fraud detection tools" in connection with the Google Play ecosystem); SAC ¶ 109 (describing Google's scam victim reimbursement fund); SAC ¶ 145 (describing the warning label that Google includes on the back of gift cards).  Indeed, Google "defines its role in the Google Play ecosystem to include 'helping developers fight fraud.'"  SAC ¶ 80.  The new allegations illustrate that Google is actively seeking to eliminate fraud in the Google Play ecosystem, not incentivizing scams and profiting therefrom.

The Court concludes that the SAC is inconsistent with a plausible inference that Google acted with criminal intent.  The Court also notes that *Siry*'s articulation of the careful planning and

26

deliberation standard for criminal intent postdated *Barrett*'s holding that the plaintiffs in that case had adequately alleged a § 496 claim against Apple.

\* \* \*

Because Plaintiffs have not alleged the criminal intent element, the Court finds that Plaintiffs have not adequately pled a § 496 claim against Google and need not address the remaining elements. The dismissal is without leave to amend because Plaintiffs have had the opportunity to amend their complaint and still have not sufficiently alleged a § 496 claim.

### C. Conversion

The Court now considers the motion to dismiss Plaintiffs' conversion claim. Under California law, "[c]onversion is the wrongful exercise of dominion over the property of another." *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 601 (9th Cir. 2010) (quoting *Oakdale Vill. Grp. v. Fong*, 43 Cal. App. 4th 539, 543 (1996)). "The elements of a conversion claim are (1) the plaintiff's ownership or right to possession of the property at the time of the conversion; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." *Id.* (quoting *Oakdale*, 43 Cal. App. 4th at 543–44). The alleged converter must have assumed control over the property or applied the property to his own use. *Id.*

The Court acknowledges "a split of authority in California on whether conversion is an intentional tort or a strict liability tort." *Appel*, 2022 WL 3582776, at \*8; *compare Regent Alliance Ltd. v. Rabizadeh*, 231 Cal. App. 4th 1177, 1181 (2014) ("Conversion is a strict liability tort. The foundation of the action rests neither in the knowledge nor the intent of the defendant.") (quoting *Burlesci v. Peterson*, 68 Cal. App. 4th 1062, 1066 (1998)), *with Multani v. Knight*, 23 Cal. App. 5th 837, 853 (2018) ("Conversion is an intentional tort."). Nonetheless, the California Supreme Court has explained that conversion "does not require bad faith, knowledge, or even negligence; it requires only that the defendant have intentionally done the act depriving the plaintiff of his or her rightful possession." *Voris v. Lampert*, 7 Cal. 5th 1141, 1158 (2019).

There are, of course, claims of conversion where the alleged converter has actual knowledge that the property is tainted. Imagine, for example, the owner of a car shop purchasing a used car at a value far below the market rate. Such a knowledgeable purchaser would be on

27

notice that the property was likely stolen—and the owner's wrongful possession of the stolen property would also meet the elements of conversion.  However, because conversion does not require bad faith or knowledge, an otherwise innocent possessor of converted goods with no awareness that the property was wrongfully taken can be liable despite his good faith.

In the Prior Order, the Court held that Ms. May failed to plead an ownership right in the funds or a wrongful act by Google in possessing them.  Prior Order at 29–31.  Plaintiffs have amended their theory of conversion to allege that Google had actual knowledge of the gift card scams prior to making payments to its app developers based on its anti-fraud algorithm and Ms. May and Ms. Kennedy's direct reports.  Plaintiffs further allege that Google substantially interfered with their property by retaining commissions on purchases made with the stolen property and refusing to return it to Plaintiffs.  Opp. at 22; SAC ¶¶ 317–22.

Google contends that (1) Plaintiffs have not alleged a continued ownership interest in the funds after sharing the redemption codes with the scammers, and (2) the SAC does not support a plausible inference that Google wrongfully possessed the funds.  Mot. at 18–20.  According to Plaintiffs, the facts alleged demonstrate that Google wrongfully refused to refund Plaintiffs, despite Google being on notice that the at-issue value was tainted as a result of the scams.  Opp. at 20–23.

The Court finds that the new allegations in the SAC support a reasonable inference that Plaintiffs had a right to possess the value in the Google Play gift cards, because they were tricked by the scammers into sharing the redemption codes.  *See* SAC ¶¶ 152–56, 181–84, 208–11. Google's characterization of Plaintiffs "voluntarily" turning over the redemption codes, Mot. at 18, is belied by the allegations in the SAC, which demonstrate that Plaintiffs were deceived by the scammers.  The Court also finds that the SAC alleges sufficient facts to demonstrate that Google had possession of the at-issue funds.  *See, e.g.*, SAC ¶¶ 99–107 (describing Google's control over funds after gift cards are redeemed into the Google Play Store).

The SAC alleges that the scammers redeemed the codes into scammer-controlled Google Accounts "immediately" upon receiving the redemption codes from Plaintiffs.  SAC ¶¶ 157, 186,

United States District Court
Northern District of California

214. Accordingly, at the point Google came to possess[2] the property (i.e., upon redemption), Plaintiffs have not plausibly alleged that Google had knowledge that the funds were the products of scams. Indeed, as discussed above, the existence of Google's scam-detection algorithm was not sufficient to put Google on notice that the funds were the products of scams and a scam report is not tantamount to proof of theft. Thus, it appears that the SAC only pleads Google's liability under a strict liability theory of conversion. After all, once the scammers deposited the value of Plaintiffs' gift cards in their Google Play Accounts, the later purchases and expenditures were made in the ordinary process of transacting business through the Google Play Store. At the point that Ms. May and Ms. Kennedy contacted Google and Google declined to issue refunds, Google allegedly prevented Plaintiffs from possessing their property.

The Court concludes that Ms. May and Ms. Kennedy have stated a strict liability claim for conversion, while Ms. Ehly has not, because she did not contact Google in the aftermath of the scam to request a refund, so Google had no awareness of her claim. *See Barrett*, 2022 WL 2119131, at *7 (finding that the plaintiffs who notified Apple that they had been scammed had stated a claim for conversion, while the plaintiffs who did not notify Apple had not). Accordingly, Ms. Ehly's conversion claim is subject to dismissal. Because Plaintiffs have had the opportunity to amend the complaint and have not pled a conversion claim as to Ms. Ehly, the dismissal is without leave to amend.

### D. UCL and CLRA Statutory Standing

Google argues that the UCL and CLRA claims should be dismissed because Plaintiffs have failed to allege facts establishing statutory standing. Mot. at 7–8. Google contends that the alleged harm was caused by the scammers, not Google. *Id.* In opposition, Plaintiffs urge that the SAC states facts sufficient to give rise to standing under the UCL and CLRA. Opp. at 7–8.

The UCL prohibits an individual or entity from engaging in any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "Each prong of the UCL is a separate and distinct theory of liability." *Birdsong v. Apple, Inc.*, 590 F.3d 955, 959 (9th Cir.

---

[2] The Court recognizes that Google contests that it "possessed" the funds but credits this allegation at this motion to dismiss stage of the proceedings.

2009).  To have statutory standing to bring a UCL claim, plaintiffs must establish that they "(1) suffered an injury in fact and (2) lost money or property as a result of the unfair competition." *Id.* (citing Cal. Bus. & Prof. Code § 17204).

The CLRA bars engaging in "unfair or deceptive acts or practices" related to "the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).  "By definition, the CLRA does not apply to unfair or deceptive practices that occur after the sale or lease has occurred." *Moore v. Apple, Inc.*, 73 F. Supp. 3d 1191, 1201 (N.D. Cal. 2014).  To establish statutory standing to bring a CLRA claim, a plaintiff "must not only be exposed to an unlawful practice but also have suffered some kind of damage" as a result of the alleged violations of the statute.  *Bower v. AT&T Mobility, LLC*, 196 Cal. App. 4th 1545, 1556 (2011).  Thus, a plaintiff is required to show "a causal connection or reliance" on an affirmative misrepresentation or a material omission. *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 326 (2011) (quoting *Hall v. Time Inc.*, 158 Cal. App. 4th 847, 850 (2008)).  In other words, a CLRA plaintiff must allege that a defendant's misrepresentation or omission "'played a substantial part, and so has been a substantial factor' in influencing the plaintiff's actions which, in turn, led to his harm."  *Doe 1 v. AOL LLC*, 719 F. Supp. 2d 1102, 1113 (N.D. Cal. 2010) (quoting *Hale v. Sharp Healthcare*, 183 Cal. App. 4th 1373, 1384–85 (2010)).  UCL standing and CLRA standing are properly analyzed together.  *See Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1103, 1107–08 (9th Cir. 2013).

The Court previously found that Ms. May had failed to plead harm caused by Google's alleged misconduct so as to establish statutory standing under the UCL or CLRA because Ms. May had not alleged that Google induced the gift card purchases.  Prior Order at 20–21. While Plaintiffs have added a significant number of new allegations in the SAC, the Court again concludes that Plaintiffs fail to allege statutory standing.

Plaintiffs contend that the SAC alleges "a pattern of Google['s] conduct that incentivizes and perpetuates scams."  Opp. at 7 (citing SAC ¶¶ 82–83, 85, 88, 125, 140, 149).  Plaintiffs' allegations do not establish a plausible inference that Plaintiffs lost money or property as a result of Google's conduct for the purposes of establishing statutory standing.  To the contrary, and as detailed above, Plaintiffs lost money or property as a result of the  misconduct of the scammers.

30

United States District Court
Northern District of California

To summarize, Plaintiffs were tricked by the scammers into purchasing the gift cards in valid commercial transactions after reviewing the warnings on the gift cards.  Again because they were tricked by the scammers, Plaintiffs relinquished the redemption codes.  As alleged, at the time Plaintiffs lost their money or property—namely, when they shared the redemption codes with the scammers—Google had no knowledge of or involvement with the scams.  As a consequence, Plaintiffs "have not lost money or property as a result of the unfair competition," Cal. Bus. & Prof. Code § 17204, or "suffer[ed] any damage as a result" of a practice prohibited by the CLRA, Cal. Civ. Code § 1780.

To the extent Plaintiffs seek to rely on Google's "post-sale conduct" to establish statutory standing, Opp. at 7–8, that theory is unavailing.  Plaintiffs urge that the "chain of causation of Plaintiffs' injuries" includes Google's detecting the scammers' fraudulent redemptions, failure to return the funds to Plaintiffs, and knowingly retaining the profits of any in-app transactions.  Opp. at 7–8 (citing SAC ¶¶ 7, 9, 50, 123).  This theory of economic injury is implausible and insufficient to satisfy the standing requirement under the UCL or the CLRA because it is based on Google's post-sale conduct that did not induce the purchases.  *See, e.g.*, *Moore*, 73 F. Supp. 3d at 1201–02 (dismissing UCL and CLRA claims for lack of statutory standing because plaintiffs relied on the defendant's "unfair or deceptive" conduct that took place after the sale).  Although Plaintiffs state that under *Kwikset*, the standing analysis need not be limited to pre-sale conduct, they do not explain how *Kwikset* supports the proposition that post-sale conduct can give rise to standing.  Opp. at 7.  At the page cited by Plaintiffs, the California Supreme Court explains that a consumer who relied on a misrepresentation in a product label by making a purchase has statutory standing.  *Kwisket*, 51 Cal. 4th at 330.  That is a far cry from Plaintiffs' argument that Google's post-sale conduct establishes statutory standing, and Plaintiffs do not identify any other authority in support of this contention.

Plaintiffs' UCL and CLRA claims are subject to dismissal for failure to allege statutory standing because they do not allege that they lost money or property as a result of Google's unlawful practices.  Plaintiffs have had the opportunity to amend their complaint and still have not adequately alleged statutory standing, so the dismissal of the UCL and CLRA claims is without

leave to amend.

### E. Declaratory Judgment

Plaintiffs seek a declaratory judgment to the effect that Google's attempt to disclaim liability is unenforceable as to Plaintiffs and class members, including because Google engages in practices that perpetuate the scams, knowingly retains profits from the scams, and misrepresents to Plaintiffs that there is nothing further it can do for them. SAC ¶¶ 325–32. Google argues that the Court should dismiss Plaintiffs' declaratory judgment claim because they have not stated a viable cause of action. Mot. at 20. Plaintiffs' declaratory judgment claim rises and falls with their other claims. *See Katz-Lacabe v. Oracle Am.*, 668 F.Supp.3d 928, 949 (N.D. Cal. 2023). As Ms. May and Ms. Kennedy's claim for conversion has not been dismissed, the declaratory judgment claim survives to that extent.

### F. Class Allegations

Finally, Google seeks to strike the class allegations to the extent they extend past the applicable statutes of limitations. Google also argues the class definition is overbroad. Plaintiffs contend that narrowing the class period and definition is premature at this stage.

#### 1. Time Bar

Google asserts that the Court should strike class allegations to the extent they are time-barred. Mot. at 20–22. Plaintiffs respond that whether any claims are time-barred is a fact-intensive inquiry and should be determined later in the proceedings. Opp. at 23–24.[3] In the SAC, the Class Period is defined as the period from January 1, 2015, to the present. SAC ¶ 230. And the sole remaining claim—conversion—has a three-year statute of limitations period. Cal. Code. Civ. Proc. § 338(c)(1). Plaintiffs accordingly seek to extend the class period from March 5, 2021 (three years before this action was filed) to January 1, 2015, through tolling resulting from, *inter alia*, "Google's knowing, active concealment, and denial of the facts alleged." SAC ¶¶ 222–28.

---

[3] To the extent Plaintiffs argue that Google's continuing violation of § 496 is a basis for extending the statute of limitations, Opp. at 24, the Court need not consider that contention because the § 496 claim is dismissed without leave to amend.

United States District Court
Northern District of California

The equitable tolling doctrine permits a court to toll the statute of limitations when a plaintiff who possesses several legal remedies "reasonably and in good faith, pursues one designed to lessen the extent of his injuries or damage." *Addison v. State,* 21 Cal. 3d 313, 317 (1978); *see also Butler v. Nat'l Cmty. Renaissance of Cal.,* 766 F.3d 1191, 1204 (9th Cir. 2014). The Ninth Circuit has held that equitable tolling can "be applied in situations where, 'despite all due diligence, [the party requesting equitable tolling] is unable to obtain vital information bearing on the existence of the claim." *Albillo-De Leon v. Gonzales*, 410 F.3d 1090, 1099–1100 (9th Cir. 2005) (alteration in original) (quoting *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1207 (9th Cir. 1995)). "In tolling statutes of limitations, courts have typically assumed that the event that 'tolls' the statute simply *stops the clock* until the occurrence of a later event that permits the statute to resume running." *Socop-Gonzalez v. INS*, 272 F.3d 1176, 1195 (9th Cir. 2001).

In the Prior Order, the Court found that Plaintiffs had failed to allege sufficient facts, such as diligence or affirmative deceptive conduct by Google, to support a claim for tolling. Prior Order at 16–18. In response, Plaintiffs have added allegations detailing Google's possession and control of the victims' funds, SAC ¶¶ 94–109, and asserting that Google maintains a policy of concealing from victims its ability to freeze the flow of value through the Google Play ecosystem by "falsely telling them that their stolen property cannot be recovered once the code has been provided to the scammer," SAC ¶¶ 110–33. Plaintiffs argue that Google's concealed control over and profit from the at-issue funds delayed Plaintiffs' ability to discover their claims. Opp. at 23–24.

The Court finds that Plaintiffs have not alleged that they reasonably relied on any material misrepresentations. Plaintiffs also do not argue that they exercised any diligence, and instead merely state that class members could not have discovered their claims "in the normal course of diligence." SAC ¶ 225. Furthermore, Plaintiffs have not alleged a duty to disclose the whereabouts of funds to claimants; Plaintiffs only allege that a duty existed. SAC ¶ 228 ("Google was and remains under a continuing duty to disclose to Plaintiffs and Class members the true nature of its involvement in gift card scams."). As the Court explains above, a conclusory recitation of this duty does not give rise to one. Thus, Plaintiffs' theory of equitable tolling

33

remains deficient and it relies on claims the Court has now rejected.  Recognizing that equitable tolling is a fact intensive exercise and that other portions of the class definition will need to be revised, the Court will grant the motion to strike the class period dating back to 2015 with leave to amend.

### 2.   Class Definition

Google also seeks to strike the proposed class and subclass definition as overbroad, including because not all class members contacted Google.  Mot. at 22–24.  Plaintiffs argue that because liability turns on Google's actions and knowing retention of stolen funds, the class definition is not inconsistent or overbroad.  Opp. at 24–25.

The SAC includes two proposed class definitions.  The proposed "Nationwide Class" includes

> [a]ll persons in the United States and its territories who purchased one or more Google Play gift cards at the direction of people whose identities they did not know and did not redeem the gift cards for themselves or give them as a gift but instead provided the redemption codes to the people whose identities they did not know (the "Scam") and were not refunded the money they paid for the gift cards by Google or any other source (the "Class").

SAC ¶ 229.  The proposed "Contract Subclass" consists of "[a]ll Class members who contacted Google directly or indirectly through law enforcement and reported the Scam."  SAC ¶ 231.

The court may strike class allegations where "the complaint demonstrates that a class action cannot be maintained on the facts alleged," *Salaiz v. eHealthInsurance Servs., Inc.*, 2023 WL 2622138, at *5 (N.D. Cal. Mar. 22, 2023) (citation omitted), and where the allegations are "inconsistent with Plaintiffs' theory of the case," *Sandoval v. Ali*, 34 F. Supp. 3d 1031, 1044 (N.D. Cal. 2014).  Questions of class scope, commonality, and predominance are often issues best decided at the class certification stage.  *Clark v. LG Elecs. U.S.A., Inc.*, No. 13–cv–00485-JM, 2013 WL 5816410, at *16 (S.D. Cal. Oct. 29, 2013).

The only claims that survive dismissal are Ms. May and Ms. Kennedy's claims for strict liability conversion and declaratory relief.  Accordingly, it is apparent that both the proposed Nationwide Class and the Contract Subclass envision a much broader class that includes individuals who did not contact Google to report that they were the victims of scams (and hence

34

do not state such claims).  But since actual knowledge by Google of the scams is central to the claims and key to the § 1668 issue, the class must be limited to individuals who contacted Google to report that they had been scammed.  As a consequence, the Court will grant Google's motion to the extent the class definition is inconsistent with this Order.  The dismissal is with leave to amend the class definition to limit the class to those who were scammed and directly reported the scam to Google.

## V.   ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

(1) Google's motion is GRANTED IN PART and DENIED IN PART as follows:

    a.   Google's motion to dismiss Plaintiffs' claim No. 1 for unfair practices in violation of the UCL is GRANTED WITHOUT LEAVE TO AMEND.

    b.   Google's motion to dismiss Plaintiffs' claim No. 2 for unlawful practices in violation of the UCL is GRANTED WITHOUT LEAVE TO AMEND.

    c.   Google's motion to dismiss Plaintiffs' claim No. 3 for unfair practices in violation of the CLRA is GRANTED WITHOUT LEAVE TO AMEND.

    d.   Google's motion to dismiss Plaintiffs' claim No. 4 for unlawful practices in violation of the CLRA is GRANTED WITHOUT LEAVE TO AMEND.

    e.   Google's motion to dismiss Plaintiffs' claim No. 5 for receiving, retaining, withholding, or concealing stolen property in violation of Cal. Penal Code § 496 is GRANTED WITHOUT LEAVE TO AMEND.

    f.   Google's motion to dismiss Plaintiffs' claim No. 6 for conversion is DENIED as to Ms. May and Ms. Kennedy and GRANTED WITHOUT LEAVE TO AMEND as to Ms. Ehly.

    g.   Google's motion to dismiss Plaintiffs' claim No. 7 for declaratory judgment pursuant to 28 U.S.C. § 2201 is DENIED as to the conversion claim and GRANTED WITHOUT LEAVE TO AMEND as to all other claims.

    h.   Google's motion to strike Plaintiffs' class allegations that are time-barred is GRANTED WITH LEAVE TO AMEND.

       i.   Google's motion to strike the class definition is GRANTED WITH LEAVE TO AMEND.

(2) Ms. Ehly is DISMISSED from this action because she does not have any remaining claims.

(3) Plaintiffs SHALL file an amended complaint within 30 days after the date of this order, by **April 20, 2026**.  Plaintiffs may not add new claims or parties without express leave of the Court.

Dated:  March 20, 2026

_____
BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California

36